All right, good morning again. Case number 17, 1285 McCracken v. Progressive Direct Insurance Company. Sorry for starting a couple of minutes late this morning. I was with an Uber driver who visited every stoplight in the city. Have you ever had that experience? I have. If there's a stoplight to be seen, I saw it. Okay. So I can't even blame it on my colleague. Not that I would. We'll hear your counsel. Good morning, Your Honors. Nelson Wanaka on behalf of Plaintiff's Appellants. May it please the Court. Effective January 1, 2008, the legislature amended Colorado's U.M. statute to state that the amount of U.M. coverage available to an insured, quote, shall not be reduced by a set-off from any other coverage, including but not limited to legal liability insurance, medical payments coverage, health insurance, or other uninsured or underinsured motorist vehicle insurance. Now was that statute in effect at the time this settlement was made? Yes. And so the set-off was applied nonetheless. Is that correct? Yes. Yes, it was. It was applied nonetheless, knowingly to the counsel whose client signed the agreement or not knowingly? I don't know that there's evidence in the record. Well, I mean, we'll presume lawyers know the law, but I mean, was the client represented by counsel? The clients were represented by counsel. There are a couple of cases pending at the Colorado Court of Appeals level raising this very issue. Correct. And should we await, debate this case after argument to await that ruling from the intermediate court? I think this Court should, just because it decides an issue of, you know, a sub-state law, which, I mean, seems likely to me, given that it's a U.N. case. It's a matter of first impression at this point. It is. With, you know, seven or eight related cases in courts throughout Colorado that deal with similar issues. So, yes, I think that's warranted in this case, is sort of holding the case in abeyance until the Colorado Court of Appeals and ultimately the Colorado Supreme Court decides this issue. Oh, you're not advocating the latter. I said intermediate court, right? Intermediate court, yeah. The Colorado Supreme Court may have to abate while people decide whether they're going to seek cert and whether the court decides to grant it and then all of those processes. Just until we get a decision from the intermediate Colorado Court of Appeals. So, despite the language in the amended UIM statute prohibiting all set-offs and MedPay set-offs specifically, the defense in this case continues to take MedPay set-offs from the UIM coverage benefits that they offer to their insurers and have admitted that they did so to the plaintiffs in this case. Nevertheless, the district courts below held that because the plaintiffs signed general releases in order to receive the benefits they were contractually and statutorily required to, or owed, the actions to seek redress for the improper set-offs had to be dismissed. So the issue as I see it, and as framed by the parties and the courts below, is can a release be used to accomplish what the law forbids? Can an insurer use the settlement mechanism to do what the legislature has said that it cannot? Is it okay that the defendants who admittedly took set-offs in this case, or that the defendants can take set-offs that they're not allowed to take simply because the insurer signed a release? And I believe the answer to these questions is no. First, all contracts, including general releases, even certain constitutional rights can be waived as long as it's done knowingly by counsel, right? Well, I think there's a difference. So if a lawyer knows about the statute and then agrees to a settlement, why isn't that a matter between the client and the lawyer? Because I think there's a difference between a right and a law that regulates insurance company conduct. I don't think the UIM statute gives insurers a right to not have a set-off. I think it's the legislature saying, insurance companies, you can't do this. And I think it's a critical distinction in this case, is that it's not a negotiation that should ever take place, is an insurance company saying, well, I'm taking this set-off. And you have to waive your rights in order to receive the benefits that this contract owes you, and that the UIM statute says the insurance company has to offer you when you purchase a policy. But there is a difference between a settlement and a judgment. And in this case, of course, we're talking a settlement, and Judge Jackson below asked counsel whether there are any cases that involve a settlement on a statute that had been previously interpreted consistently in that manner, where the court had later called her on, subsequent called her on, undone the settlement. And the answer was, we don't have any cases. Are there any cases now, or are you asking us to do something that has not been done? It has not been done, to my knowledge. I mean, we've got a number of actions that are all considering this issue, and at least at the trial court level, they have all been decided similarly, which is just, you know, the release bars this. So I do think it has to be considered, I mean, for the first time. But getting to, I mean, your point about the difference between a settlement agreement and a judgment, I don't see a big difference between what happened in these cases, where they were settled, and Calderon. And so it was important to both of the district court judges below. They said, you know, well, you could have gone to trial, right? But an insured doesn't have, especially in the U.M. context, an insured doesn't have to go to trial to get the benefits they're entitled to. The Fisher case out of the Court of Appeals, which is on certiorari now, is dealing with that issue. 1031104 states that it can be an unreasonable practice to force the insured to go to trial. And so that's sort of what we're up against here, is yes, they settled, but had they gone to trial, I'm fairly confident the result would have been the exact same thing that happened in Calderon, which is they recovered a judgment in Calderon, and then there was a remitted. Was these all liquidated damages, or was there a range of damage that could be granted? So with respect to the MedPay issue, it's liquidated and known. I mean, in every one of these cases, it's $5,000, $10,000. It's known and liquidated in that sense. This was not some negotiation where, you know, the insurance company said, well, you know, I only think you're entitled to $6,000 of MedPay coverage, and the insured said, no, I think I have $8,000. It was undisputed that the MedPay amounts exceeded the available coverage for, you know, for medical injuries, and that the full amount was taken in all of these cases. You know, we alleged in our complaints that this was a company-wide practice. It's an industry-wide practice, in effect. That during the negotiation of UIM claims, Progressive here and other insurers just deducted the amounts that they paid from, you know, under MedPay coverage from the amounts that they would offer their insured. So say you have $25,000 in damages, and $10,000 was paid under the MedPay coverage. The insurance company said, we offer you $15,000. If you want it, sign this release. It's not required by the policy. And the plaintiff signed. Or face the prospect of, A, not getting the money they were entitled to, any benefits, or going to trial. I'm sorry. This wasn't really about the amount of UIM coverage that was available. It was about what they wanted to settle their claims. What amount were they willing to take to settle their claims? And so I see a distinction between this and Calderon, where they went to a jury trial to see what they could get. Here they voluntarily chose, and they were represented by counsel, to take an amount. They all agreed to settle their claims. And I agree with you. I agree with you. I mean, there is a difference. It's a valid distinction. It is a distinction between the two cases. But our simple point in this is that it is not a valid negotiation for an insurance company to say, I'm taking this reduction that the legislature says I can't do. Parties can't negotiate around the law, ever. And I think that's a really important point. Well, at the time they were negotiating it, they weren't negotiating around the law. Calderon hadn't been decided. I mean, it was an acceptable interpretation. It was the consistent interpretation. So they weren't, at that time, negotiating around the law. And I disagree. I mean, I think that's where the retroactivity analysis comes into play, is that, I mean, I've... The policy argument I think you make is probably the best argument you might have for, versus just trying to retroactively apply a decision interpreting a statute. Well, I think the two are very closely related, right? Which is why we, I mean, this issue was raised and argued extensively in both actions, consolidated actions below. Well, let me ask you this question. Was this case settled for $50,000, and then the insurance company took a set-off at the time they paid the 50, or was it settled for $40,000, and the set-off becomes irrelevant? Which of the two happened? So just using that as a hypothetical, the benefit... Oh, it's not a hypothetical. My question's not a hypothetical. Well, just the benefit amount. The question is, a question of fact based on the record in this case. Was the case settled for $50,000, and the insurance company took the set-off that they weren't entitled to, or was it settled for $40,000 with the set-off essentially having been an element of discussion and consideration, but the settlement itself was for $40,000? So the MedChase set-off, the deduction, was taken before. I mean, it was a part of the... As I explained, the insurance company said, you know, these are what we think your damages are. We're taking the deduction, so we're offering you $10,000 less, and if you want it, sign a release. That's how it happened. It wasn't, we're going to pay you. So the insurance company set the amount of $50,000 in the negotiations. The insurance company said, we're entitled to $10,000 set-off. Therefore, we owe you $40,000, and we offer you $40,000. Take it or leave it. Correct. Is that the latter? Yeah, it wasn't a set-off after the fact, in other words. It wasn't, we're going to, you know, we determine it's $50,000. We're going to pay, you know, enter into an agreement and then take the set-off. That did not happen. But the insurer didn't pay full value on the uninsured or the underinsured amount. In Judge DeSero's example, $50,000. And what I'm getting at is that this is not a case where the MedPay deduction reduces the plaintiff's ability to obtain full compensation for loss, like Crawley's, where the subrogation took away money and, therefore, the insured did not get full compensation. Here, the amount of settlement was less than the $50,000, right? Correct. Well, yes. Even before the MedPay. We have three different cases we're also talking about. And all three of them are the same, right? Well, they're similar. I mean, they're obviously different benefits. But they're all the same as far as not capping out the settlement on the limits of the uninsured or underinsured amount. I believe so, Your Honor. I believe that's correct. But that's, again, getting, it's relitigating Calderon. That's exactly what, you know, that's exactly what the Court of Appeals held in Calderon, and that the Supreme Court said we're not countenancing that interpretation of the statute, that this is a, you know, it's lower than the limit, in other words. That is not what Calderon stands for. So I would. In all three cases, are the limits $50,000? They are not, no. I don't believe so. Well, what are they? I mean, help us out. I mean, I can certainly look into it. I think it may be $50,000 in UIM. And were we talking about UIM limits? Yes. I believe it is. And so the amount paid is different on every one of the consolidated actions, and the amount of the MedPay set-ups are different in all of the consolidated actions. And so I would agree that, you know, we are talking about a case where it's less than the, you know, less than the limits of the coverage. But Calderon says that's not the way we interpret the amended UIM statute, as to whether this is, you know, whether there's a difference in treatment and whether an insurance company can take a set-up when the amount in dispute or the amount that's going to be recovered is less than the amount of the insurance limits. That's what Calderon rejected, the Supreme Court opinion of Calderon. So does the Court have any further questions? You wanted to reserve time, didn't you? Yes. Well, the best way to do that is to do it. I'll reserve the rest of my time. Thank you. Thank you. Good morning, Your Honors. My name is Casey Culligan. I'm arguing on behalf of both defendants in this consolidated case, both Progressive and USAA. But I do have Mr. Tom Butler at my counsel table with me today, who represents USAA. So if the panel has any specific questions factually related to USAA that I cannot answer, he is available. I think I can start out by answering the question that the panel specifically asked about the limits of each of the specific policies, and I can direct the panel to the record citations in case you or your clerks need to go back to those. For plaintiff's practice. But we don't worry about our clerks. That's an internal matter that we don't argue. We don't discuss it in court. Thank you. Okay. No problem. For Ms. McCracken, she did have a 50-100 limit, and the release was signed for $41,000. So it was for less than policy limits, and you can find that at the appellant's appendix to page 282. For Hecht, assuming her appeal was not waived and it was perfected, which is a disputed issue in this case, she had a 25-50 limit and was paid $21,000. So, again, was under limits issue, and you can find that in the appellant's appendix at page 203. For Archuleta, the USAA plaintiff, she had a 50-100 UM limit and was paid $17,000. So these are all less than limits, and if you want that record citation, it's at appellant appendix 635. In all three cases, was the set-off applied? The set-off was taken in the claim negotiation. But as far as being part of the actual settlement, what you have is a standard release. But so in the claim negotiations, you say we're entitled, you represented that you were entitled to a set-off. Undisputably, yes. Undisputably. We believe that to be the case. And the statute undisputably prohibited that, correct? After Calderon, we believe, we agree that was a statement. Well, Calderon merely interprets the statute. Agreed. The statute was existing at the time, right? We agree. And what is the language of the statute that Calderon interprets as being a clear meaning of the statute? The statute is as Mr. Wanaka read to you at the beginning, and that was disputed. I mean, and as, you know, as the problem is, right, it is not as clear from a contextual standpoint. The point is, have everybody believed that when Calderon came out, the insurance industry should have said, oh, this is clear what happened. Right? But let me give you one example. Progressive, for example, knew that this was an issue that was disputed. And so as early as 2013, this is before the Calderon Court of Appeals opinion, which was in 2015, or 2014, excuse me. Progressive went, they had this dispute with another claimant, Mr. Proctor. And they went to, they sought declaratory judgment in the trial court, and they literally got a ruling that said, your non-duplication provision in your policy does not violate public policy. So Progressive, for example, as an organization, said, okay, we're going to go ahead and continue to take the offset because we have a trial court opinion that said it doesn't violate public policy. And there's no binding Colorado appellate court authority to the contrary. And so that's how we evaluated claims. Right? So contrary to plaintiff's argument that insurance companies were incorrectly interpreting the statute, we actually had trial court opinion, and there are six others. And we cite those in the record at the Appellant Appendix 702, and the Proctor is at 441, that says we were doing exact, we were interpreting the law correctly. And nobody said to the contrary until Calderon. And that context is important. It's very important to this case. And in Calderon, didn't the Colorado Court of Appeals agree with you? Yes, absolutely. Absolutely agreed with us. And not until the Supreme Court did they say, you know what, we disagree. So that shows that you didn't act in bad faith, but it doesn't win you the case, does it? Well, there's no bad faith allegations here, right? Well, I understand that. But that seems to be the argument. We had good reason to believe this. Sure. We agree. But that doesn't carry the day. Absolutely not. Nor would we take it. Let me ask you this, because you brushed up against something, and I'm just curious what the answer is, which is, again, during the trial proceedings with Judge Jackson, he said after Calderon, even starting today, if an insured were to come in with the same policies and say, I don't want to deduct my med pay, the insured could still insist that that happen. Is that still your position? Progressive would not adjust the claim that way today, post-Calderon. All right. So the position has changed. The claims adjustment position has changed. Would the release still be binding? I think it's a different question. But to answer the very specific question that you asked me, would Progressive adjust claims that way post-Calderon? No, of course they wouldn't. You say of course, but the answer in the trial court was, yes, we would have full power to do that. It's a matter of negotiation, so why not take a stab at it? I disagree a little bit with the answer, and that was in USAA's case. And I disagree a little bit. I think the question was asked a little bit differently. Would USAA have the ability to release a claim in the same manner that they have? And I think the answer is yes, based on the exact conversation that Judge Lucero was having with Mr. Wanaka earlier today. Well, here's Judge Jackson. And you would say that even today you could evaluate the case at $22,000, subtract the med pay, and it's perfectly fine. Calderon doesn't apply. That's your argument? Answer. That's her argument. And I think if you read on further in the transcript. Go ahead. Would you like me to? Please. Okay. I think if you read on in the transcript and what Mr. Butler and Mr. Jackson, the interchange they were having, was similar to the interchange that Judge Lucero was having with Mr. Wanaka, is that the release, based on those circumstances, would still be legal. Because two parties who knowingly know what the law is, right? Because keep in mind, if Calderon is indeed retroactive, which of course we dispute, but if indeed it is, plaintiffs can't have it both ways. If Progressive and USAA know what the law is, and Calderon was the law back to 2008, so did Plaintiff's Counsel and so did Plaintiff's Co-Counsel, who represented these plaintiffs back in the day. Both parties equally knew that Calderon was the law in the day. And they equally knew their rights. And they equally negotiated those rights away in the same way. So why Frank Azar's office, right? Plaintiff's Co-Counsel here today, right? Who represented Mr. Calderon and represented Ms. McCracken and represented Mrs. Heck and represented Mr. Archuleta, right? They advised Mr. Calderon to litigate his case all the way up to the Supreme Court. Those same lawyers are advising the three plaintiffs here in front of you today to take a settlement. So they knowingly knew the law. If it's true, it's retroactive. If Progressive knew the law, so did Plaintiffs and their counsel. And they made a knowing decision to enter into this release. And if you take a look at the USAA release, on the four corners, which plaintiffs are admitting that they're not attacking the validity of, it releases known and unknown claims. If you take a look at the Progressive-McCracken lease, it releases a disputed claim. All claims related to the U.M., claims related to her accident. Those releases take into account the contingency that future claims may, they may get to the ability to have future claims. The Supreme Court may have a new opinion. And that opinion may be retroactive. But they decided to pocket the consideration that USAA and Progressive gave them in order to walk away from the right to sue on that contingency. That's why releases are so important. There has to be finality to that. And both parties bargained for that risk. And that's why it's so paramount that this Court honor the finality of those releases. Well, as you have your colloquy, my colleague, it does seem to me that the issue for us, for this panel, is whether the district court erred in concluding that the claims were untimely. That is the issue before us, right? Or is it? Well, how do you frame the issue that we are supposed to resolve? Right. The issue that's in front of the courts today is whether the plaintiffs are entitled to bring the lawsuits that they did. Because they're barred by release. So it's a standing question? Is that what you mean by entitled? It's not a standing question. That's why I'm asking. Is it a statute of limitations question? What is the issue? Sure. That's a fair point. The issue is a release is an affirmative defense. And it's affirmative defense pled by both Progressive and USAA. And in Progressive's case, we filed a 12b6 motion saying you failed to state a claim because you don't have a claim that you have released that claim. In the USAA case, they brought a Rule 12c motion for judgment on the pleadings saying you don't have the ability to bring this claim as a matter of law because you have released the very claim that you brought. So the issue is, do the plaintiffs have the ability to bring a claim as a matter of law when you've released it? Under the same standard of review, the same issue, just two different procedural tools to answer the very same question. All right. I believe that's the question that's presented to you today, Your Honor. Thank you. Sure. If you don't have any further... Well, may I ask, of these two pending Colorado Court of Appeals cases... Yeah. ...the same question I asked your colleagues. Perfect. You are reading my mind, if that's possible. I'd love to answer the question that you asked Mr. Wanaka, is should we evade this case and defer to the Court of Appeals? Right. Not necessarily defer, but at least have the benefit of their thinking, because our deference is owed only to the highest court. Right. My answer is the unequivocal no. And I'd like to give this Court a little bit of the full context of the State of the Union of these related cases, if you don't mind. Yes. What is this? Apart from the State of the Union, what is the State of Affairs? We need more time. Have they been argued yet, or are they an issue before the Colorado Court? What's the status? I'm going to pull out my status chart here. There are nine cases pending that are related, all brought by the same plaintiff's firm. If it becomes the State of the Union, it's going to become very complicated. It's a poor choice of words on my part. No, I think it's actually a good choice of words. Adds a little humor to the case. There are nine cases pending that are all brought by the same counsel that all have the same or similar allegations. There are five pending in Federal court and four pending in the State courts. The five that are pending in the Federal court, there are two that are before you today. Right. So you are caught up on those cases. There are three that are pending in the Federal district court right now. And there is one pending that is in, there is, it's the Allstate case. And it has been, there's been a recommendation issued by the magistrate for dismissal on the release issue. And they're waiting for an opinion by Judge Moore. Right. And there's an objection, just to be fair, to my esteemed counsel. There's been an objection filed to that recommendation and they're waiting for an opinion by Judge Moore. But the context of that case is similar to this one in that there's the recommendation for dismissal is on release. So if I had a crystal ball, I would assume that case would also end up here one way or another on appeal. But this is where I think it becomes very critical. And then I'll go to the State side. The other two cases that are pending in Federal district court that have their ability to come up this way are two consolidated cases filed against State Farm. And there was an order issued yesterday by Judge Brimmer. And I got the case too late last night to file a notice of supplemental authority. But I plan to do so today. Although I did bring copies. So I'm happy to hand them to you today if you'd just like to see a copy of it. But I can leave that to your discretion whether you'd like me to formally file a letter under the rules. We'll discuss it. And if we desire either a letter or supplemental briefing, we will request it formally. Okay. And I'll tell you the context so this will help inform your decision hopefully. But the reason I think this is interesting and also I think a good argument for why you should not stay this case and look for guidance from the Colorado State Courts is because that issue, the issue that was raised in front of Judge Brimmer is not an issue at all that's pending currently in front of the Colorado Supreme Court. So Judge Brimmer dismissed the consolidated State Farm cases based on accord and satisfaction. So the two State Farm cases moved to dismiss. Those cases, State Farm does not have releases in their cases, for the UM cases. And so they filed a motion to dismiss not based on release barring the suits, but based on the settlements and accord and satisfaction, which is a similar issue to release. But it's not a four corners contract interpretation like we've argued here and like all State argued below, which is something that's coming up here. So I'm assuming that that argument will likely make its way up here. And that argument is not something that's currently pending in any State District Court and not something that's currently pending in front of the Colorado Court of Appeals. We're not going to kind of resolve cases that aren't before us. I do have a question about that. I guess I'm a little confused. If it is different than what we have here, if it's an accord and satisfaction argument, why does it matter whether we – I'm confused by how you're connecting this. Wouldn't it still make sense for us to wait because our case, this specific issue has been raised and we would get direction on this specific issue? I don't understand why that case, which has a different issue, which will end up here probably anyway, will make any difference to whether we would hold on to these. Sure. I think for a couple of reasons. Number one, this Court is going to have to make its own determinations on these issues anyway, even if it stays. But I think one of the important reasons I want to – On that issue, maybe. Correct. That's what I'm saying. I agree. But it has an important issue that is connected to this case in that Judge Brimmer agreed with Judge Jackson and Judge Archuleta and Judge Schaefer in his recommendation in that the public policy of Colorado doesn't have any relevance when you're talking about the four corners of a release. And even Judge Brimmer said in his order that Colorado public policy didn't come into play when he was considering dismissal on accord and satisfaction, which means if you go with a release direction or you go in accord and satisfaction, there's no reason to defer to Colorado judges when Colorado public policy didn't come into play to trump consideration of these affirmative defenses. So even in those two contexts, there's no reason for this Court to defer to Colorado state judges. It's way over your time, but I'm letting you go because I'm hoping to get an answer to my question about the Colorado Court of Appeals case status. Okay. Yes. Four cases in the Colorado State Court. One is American Family v. Airline. Too much detail. Sub, give me the big picture, then give me the little picture. Sure. American Family v. Airline set for oral argument in the Court of Appeals on May 10th. All right. Two other cases are pending on a consolidated basis, Unitron and MetLife. Briefing closed on March 21st, not yet set for oral argument. The other case is pending still in the state district court and state pending review. That's not in the Court of Appeals yet? Correct. All right. Good enough. Good enough. So when are we likely, based upon the current state of the case disposition at the CCA, would you take a wild stab at the guess as to when we might have an answer? From the Court of Appeals? Mm-hmm. Based on my experience, nine, 12 months. Okay. Thank you. Of course. Your time is way over. If we need additional time, we'll extend additional time to appellants to balance things out, but we are on a very tight schedule this morning, so I won't do that yet. Judge Phillips, just to get to your point, I think it's telling that in the Archuleta matter, they took a different position below saying that under this rubric, they could still do the same thing post-Calderon and be, you know, insulated from liability. How does that bear on public policy? I think it bears on public policy hugely because under this framework, there is a giant gap in public policy law. Okay. And so essentially now, and this act, it really terrifies me because what is to stop an insurance company from taking any of the other actions that have been invalidated by the Colorado Supreme Court, like the trial de novo clause, and just incorporating it into its negotiations, saying, well, we don't believe you're going to recover that much, Mr. Insurance, so we're going to offer you $1,000 unless you take this case to trial and you have to sign a release. Is that okay now? And so that's why I framed the issue in this case is, does the public policy favoring a general release trump, you know, the ability of courts to unwind a release when it conflicts with statute and the purpose behind them? And I think the answer has to be no, or it potentially allows them to continue this conduct as long as they get a general release, which they require in every case. So it is very concerning, and there is a huge impact that can potentially be, you know, argued or effectuated in this case. I have three seconds left. Thank you, Your Honors. The remaining argument has been helpful, and we understand the issues. So the case is submitted. Counsel are excused.